O. J. Salisbury v. C. F. Iddings et al.

[Filed July 1, 1890.]

1. **Negotiable Instruments:** False Representations: Failure of Consideration: Transfer. O. J. S. brought his action against C. F. I. and H. A. I. to recover a balance of principal and interest on their promissory note, payable fifteen months after date thereof, to the order of N. S. and indorsed to O. J. S. before maturity. Defendants set up want of consideration in the quantity, quality, and value of certain stock, furniture, and fixtures of the Union Pacific hotel and eating house at Cheyenne, and of certain accounts due and transferred with the possession and property of the hotel and eating house by O. J. S. to H. A. I., and falsely and fraudulently represented by O. J. S., and for part payment of which the note in controversy was given. *Held,* That under the evidence O. J. S. negotiated the sale and falsely and fraudulently represented the quantity, quality, and value of the property different and greater than it actually was, and the note made payable to a third party at his suggestion and collusion. O. J. S. does not stand in possession as an innocent holder of negotiable paper before due, but is chargeable with the amount of the failure of the quantity, quality, and value of the goods, fixtures, and accounts sold and transferred by O. J. S. to H. A. I.

2. **Evidence** on the part of defendants admitted over objections of plaintiff, *held,* rightly admitted.

3. **Certain testimony** offered by plaintiff, *held,* rightly rejected.

4. **Instructions** examined, and *held,* rightly given.

5. **The evidence** examined, and *held,* to sustain the verdict.

Error to the district court for Lincoln county. Tried below before Hamer, J.

*G. W. Heist,* and *Hoagland & Risse,* for plaintiff in error :

The law will not aid a party capable of taking care of his own interests, who has made a losing bargain, unless deceit, against which ordinary care could not protect him, has been practiced. (*Noetling v. Wright,* 72 Ill., 390 ; *Mil-*

*ler v. Craig*, 36 Id., 109 ; Cooley, Torts, 483*, and cases; *Bristol v. Braidwood*, 28 Mich., 191.) The representations were mere expressions of opinion, on which defendant relied at his peril. (*Saunders v. Hatterman*, 2 Ired. [N. Car.], 32; *Credel v. Swindell*, 63 N. Car., 305; Bishop, Contracts [1887], sec. 664.)

*Beach I. Hinman*, and *Nesbitt & Grimes, contra:*

Redress will be afforded without regard to the means of deception, whether by word, act, or concealment. (*Tallon v. Ellison*, 3 Neb., 74, and cases; *Faulkner v. Klamp*, 16 Id., 178; *Phillips v. Jones*, 12 Id., 215, and cases.) Proof of fraud in the inception of a note casts the burden on the holder to show his *bona fides*. (*Woodward v. Rogers*, 31 Ia., 342.) Plaintiff should have asked for a proper instruction if he was dissatisfied with those given. (*Post v. Garrow*, 18 Neb., 688; *R. V. R. Co. v. Fink*, Id., 93; *B. & M. R. Co. v. Schluntz*, 14 Id., 425.)

COBB, CH. J.

This action comes up on error from the district court of Lincoln county; the plaintiff in error was also the plaintiff in that court. The action was brought on a promissory note executed by H. A. Iddings and C. F. Iddings, dated at Cheyenne, Wyoming, December 1, 1883, payable on or before fifteen months after date to the order of N. Sweetland for the sum of $14,058, with interest at one per cent per month from date until paid, which note was indorsed in blank by N. Sweetland and also had indorsed thereon a payment of $835.20, made June 6, 1885, all of which was sufficiently set out in plaintiff's amended petition; also that said N. Sweetland, for a valuable consideration, indorsed and delivered said note to plaintiff before the same became due, admitting the payment as indorsed on said note and claiming judgment for $887.67, with interest

47

thereon at the rate of one per cent per month from the 6th day of June, 1885.

The defendants answered jointly: First, by a general denial; second, admitting that said note was signed by said H. A. Iddings as principal, and by C. F. Iddings as surety, and alleging that said note was given in part payment for a half interest in certain furniture and hotel credits in the Union Pacific hotel in Cheyenne, Wyoming Territory, bought by said H. A. Iddings of said plaintiff; that no consideration whatever passed from N. Sweetland for said note, but the entire transaction was with said plaintiff, and he had said note drawn in favor of said Sweetland with the intent to carry out the fraud hereinafter set forth; that said plaintiff sold to said defendant the half interest in said fixtures, furniture, stock, and credits of said Union Pacific hotel, and in selling the same, falsely and fraudulently represented the value of the same, and the quality of the articles so sold, and upon the statements so made by plaintiff, with relation to the articles therein, and the quantity, value, and quality of the articles therein contained, defendant entirely relied and purchased the principal part of the same, to-wit, the articles and credits hereinafter mentioned upon said statement, to-wit, that said half interest was sold to H. A. Iddings for $6,865. Said plaintiff falsely alleged that said property had appreciated in value up to the time of said purchase and since the same was purchased in July, 1882, from one Jones, in the amount of twenty-five per cent, when said property had in fact depreciated over twenty-five per cent and was of less value than it was when purchased in an amount of $2,500; that said plaintiff turned in to said H. A. Iddings two barrels of whisky and charged the same to said defendant, which were returned and not kept, they being of no value, and had not been paid for, of the value as represented by plaintiff of $270.27; that plaintiff turned in a range, falsely representing the same to be in good condi-

tion, at a valuation of $1,250, which had no value what-
ever; that plaintiff charged up one cow in excess of what he
owned, and did not turn in, valued at $50; that plaintiff
falsely charged for twenty-five gallons of brandy at $2.50,
which proved to be wine costing $1.50, in excess $25; also,
twenty-three and one-half gallons of wine at $2 per gal-
lon, which was worthless, amounting to $47; also, fifteen
and one-half gallons of Catawba wine at $2.45, which
was worthless, amounting to $37.90; also, eleven gallons
of catsup at $9.90, which was worthless; total, $1,690.07.

The plaintiff charged up and turned in the following
credits due said firm, and falsely claimed that they were
good and collectible, which were worthless and uncollecti-
ble, to-wit: (Here follows a list of thirty-four accounts
against as many several persons, amounting in all to
$654.70.)   That plaintiff turned in and charged up thirty-
nine gallons of brandy, falsely claiming that it cost $6.50
per gallon, bought of Iler & Co., when it only cost $2.50,
$150, and freight on the same at thirty-one cents per gal-
lon, which only cost ten cents per gallon, an excess of
$8.19.

That in the agreement the defendant H. A. Iddings
agreed to pay his part of certain enumerated debts of the
prior firm in said hotel, to-wit, Sweetland & Rockafellow,
amounting to $100, said plaintiff agreeing that if there
were debts in excess of said amount said defendant should
pay the same ($816.94), and that said plaintiff would
allow and pay said defendant the excess over $100 so
paid said plaintiff.   At this time, having purchased said
Rockafellow's interest in said hotel business, and liable
with his brother-in-law Sweetland for said debts, pursuant
to said agreement, said defendant and Sweetland afterwards
paid the following of the same debts due by said firm, to-
wit : (Here follows a list of thirty-one debts amounting in
the aggregate to $1,347.70.)   From which deduct $100,
leaving $1,247.70.   One-half of which, $623.85, was paid

by said defendant H. A. Iddings, and is justly due from plaintiff, who agreed to pay the same to said defendant, amounting to $623.85, which with items before set forth on 3d page, $1,690.07, and items set out on 4th page, $816.94, amounts to the sum of $3,130.86.

That plaintiff, at the time of the purchase of said articles by said defendant H. A. Iddings, guaranteed that they were of the value designated in the purchase, and that the debts transferred were good and collectible; that defendant H. A. Iddings, by his agent, Charles F. Iddings, relied on said guarantee in the purchase; that none of said amounts have been paid by said plaintiff.

That by reason of the premises plaintiff is indebted to the defendant H. A. Iddings in the sum of $2,508.06, with interest at ten per cent from December, 1883, with prayer for judgment, etc.

The plaintiff replied by a general denial.

There was a trial to a jury, with a verdict and judgment for the defendants in the sum of $851.39.

Plaintiff's petition and assignments of error contain somewhat over fifty paragraphs, which, although not numbered, are separately stated, with convenient references to the respective pages of the record upon which they are predicated. As many of the errors assigned as are argued by counsel for plaintiff in the brief will be examined.

It is undisputed that the note sued on was one of a series of three notes given by H. A. Iddings as principal and C. F. Iddings as surety, for the purchase of a one-half interest in the furniture, fixtures, stock on hand, and business of the Union Pacific hotel, at Cheyenne. This property had been, something over a year before the giving of said notes, purchased from Mr. Jones by N. Sweetland, a brother-in-law of plaintiff, and one H. G. Rockafellow, and that the plaintiff advanced and loaned the money to them in severalty with which they paid for the same. These parties carried on the business for a year and more,

under the name of Sweetland & Co., when Rockafellow transferred his interest in said property and business to the plaintiff. About the time this transfer was made, the defendant C. F. Iddings being then in business at North Platte, the plaintiff came to him at that place, who was a friend and former employe of his, told him that he was going to take the house back, and proposed that said defendant should take it, and run the house for him, and, as said defendant stated when on the stand as a witness, " made favorable propositions " to him. The witness (defendant) further stated that his partner in the North Platte business, objected to his going to Cheyenne to engage in the business as proposed by plaintiff, informed plaintiff that he could not go, and at the same time informed him, to quote the language of witness, " that my brother was in shape, and that possibly if he could sell to him under the same terms that he would take it." The plaintiff then went on east from North Platte, and witness C. F. Iddings wrote to his brother and co-defendant, H. A. Iddings, and told him of the proposition of plaintiff. It appears that H. A. Iddings was also an acquaintance and former employe of plaintiff.

When the plaintiff returned from the east and passed through North Platte, C. F. Iddings informed him of his correspondence with his brother, H. A. Iddings, and that his brother had said (or written) " that if he could get it upon those terms and make the trade, he would come out." The next time plaintiff came back to North Platte, which was some time, not definitely stated, afterwards, he said to C. F. Iddings, " You come out to Cheyenne and we will look the property over." C. F. Iddings went to Cheyenne with plaintiff and looked the property over, and talked about the matter. " This," continued the witness, " was at the time Salisbury took the house back from Rockafellow ; I forget whether at that time, or a couple of weeks afterwards, the transfer was made. We settled the matter as I supposed, talked it over among ourselves, and I

Salisbury v. Iddings.

thought the matter was all settled. I had friends there, and I went out one afternoon, supposing that the next day the transfer would be made; I got there (returned to the house) about six or seven o'clock in the evening ; when I arrived I found that Salisbury had gone. His sister, Mrs. Sweetland, said Salisbury had concluded not to make the trade; I wanted to know the reason, and she said she did not know, only that he told her not to make the transfer, that he wanted money for the house."

To the question "What were the terms of your agreement?" witness answered : "The first agreement was, that I was to take the house just as it stood; take the assets as per inventory and the liabilities also. I was to step into Rockafellow's shoes, so to speak."

Q. Did you have an inventory there of the assets of the house?

A. Yes, sir.

Q. What did the inventory show?

A. It showed something like thirteen or fourteen thousand dollars. It included fixtures and furniture.

Q. Did he show that inventory to you?

A. By his clerk, whom he had employed from Salt Lake City.

Q. (Handing witness paper.) Examine that paper and state what it is.

A. That is a balance sheet of the business there of the eating house at the close of business, December 1.

Q. State for what purpose that balance sheet was used by Salisbury in this trade.

A. It was used as a paper to show up the assets and the liabilities of the business.

Q. State what further was done by you and Salisbury.

A. When Mrs. Sweetland informed me that Salisbury had left without transferring the house, * * * I think I waited a day and wrote or telegraphed him, but answer came, any way, for me to come and see him, and I

went to Salt Lake and saw him.  I asked him why he
had left that way, and he said that after he had come from
making the trade, he thought that would not be a good
way to do business; that he might die, or something of
that kind might happen; that he had allowed Rockafellow
this money without any show; he had not paid his half
on what he agreed to pay for the house, and so he rather
objected to doing so.  Salisbury said it was not business,
and he would rather have it in better shape.  I asked him
how he wanted it.  *  *  *  He said he wanted some-
thing down and wanted it in some shape.  We talked the
matter over, and he finally told me that if I would pay
him $2,500 down and give a note for the balance, that he
would have the house transferred ; that he would write to
his sister and tell her to transfer it.  *  *  *  Salisbury
said he would sell the house on these terms.  I said I
didn't know whether my brother would have that much
money or not.  I had written him supposing that we were
to have the house without paying anything down, paying
as Rockafellow was to do—so much each month.  I said I
would see what he was willing to do.  He said: "If you
arrange the matter and give the notes, I will write my
sister."  He wanted me to make the note and sign it with
my brother.  He said if that was done he would transfer
the house.  I said under those considerations I could not
take the house on the same agreements as before.  I said
I have taken no inventory of the house; I have simply
taken your figures.  He claimed he did not know anything
about it.  I said, you certainly do, your clerk did the work.
I said I did not want to take his figures.  He said, "We
have always been good friends, and you know if that is
not all right I will make it all right."  I says, "I want a
distinct understanding if we take that house and pay so
much money down and give a note indorsed, what I am
going to pay for.  I don't know what is in the house;
there might be debts liable to come up."  He said "he

thought the liabilities would not amount to over one hundred dollars." We agreed that there would be debts to the amount of one hundred dollars that I was to pay.

Q. You said you had an inventory?

A. Yes, sir.

Q. Examine this book (handing witness a book) and state what it is.

A. It is an inventory of the stores. I recognize what it is.

Q. (Handing witness another book.) Examine that book also.

A. This is an inventory of the furniture in the house.

Q. Who made this inventory, if you know?

A. Mr. Rockafellow and Mr. Felt. Mr. Felt was Mr. Salisbury's book-keeper.

Q. Are these inventories you speak of those upon which the transfer was made?

A. Yes, sir; they had drawn them on to a balance sheet.

Q. What was the consideration paid for these premises?

A. It was thirteen thousand dollars with the furniture and fixtures. The half interest was six thousand eight hundred and seventy-five, I think.

Q. What did you get in that consideration; what was the consideration?

A. I was to have one-half interest in the furniture, fixtures, the stores of the house, and all assets; everything that was due, all accounts due the house.

Q. What else were you to pay besides the amounts which you agreed by your note, and the cash you paid?

A. Agreed to carry on whatever payments came up, of little bills, not to exceed one hundred dollars. We concluded there might be some come in that we did not know of, and they were limited to one hundred dollars. Salisbury said " If there is anything else, everything that you pay against the house, you know that I will fix it all right

with you." As I had been in his employ before I considered that he would.

Q. State if you know whether there was anything paid on bills more than you agreed to.

A. Yes, a very large number. * * *

Q. You say that is a statement of bills receivable and the debts standing against the house.

A. Yes.

Q. And that is the statement under which the trade was made, so far as that part of the trade was concerned?

A. Yes, sir.

Q. What does that statement show there was due against the house?

A. It showed the indebtedness of the house was some $6,083.96.

Q. What does it show bills receivable?

A. Two thousand and eighty-nine dollars and thirty-seven cents.

Q. What does it show the disbursements to be?

A. Three thousand two hundred and seventy-six dollars and eighty-three cents, and the receipts $3,574.38.

Q. Is that the same balance sheet that was used by you and Salisbury at the time you made the trade?

A. These footings are. I don't remember that this was the exact sheet; these were the footings. We talked the matter over in the first place before this was made. The first sale or trade was made prior to this, but the last one was made upon these same footings.

Q. Were the footings taken from that sheet and that is the sheet you had at the time you had the talk at Cheyenne?

A. Yes, sir.

Defendants here offered the balance sheet in evidence as prepared by the plantiff in the action, for the purpose of showing the basis on which the trade was made between the parties; whereupon counsel for the plaintiff examined the witness as to the competency of the evidence offered, as follows:

Q. Who was the statement gotten up for?

A. Mr. Salisbury got it up; he had Mr. Felt get it up; I don't know what he got it up for.

Q. Was it gotten up before or after you come out there?

A. He was doing it during the month and kept it along. He was there during the month going over all the data.

Q. Was it not gotten up to see the condition of the house for the month of December?

A. No, sir; it was gotten up by Mr. Salisbury. Mr. Salisbury sent Mr. Felt there for that purpose, to find out the condition of the business; he sent him from Salt Lake; he was his clerk at Salt Lake.

Q. You were not present at the time Felt was sent by Salisbury?

A. Salisbury said he had brought Felt there.

Q. You did not hear Salisbury tell Felt what to do?

A. Not when he started.

Plaintiff objected to the evidence, as immaterial and irrelevant, which objection was overruled and the paper admitted in evidence. The paper admitted is marked "Defendants' Exhibit A, April 19, '88." I copy the paper in full.

### STATEMENT FOR NOVEMBER, 1883.

*Disbursements.*

| | | |
|---|---:|---:|
| Groceries and supplies | $307 | 14 |
| Expenses | 210 | 70 |
| Help | 164 | 07 |
| Furniture and fixtures | 9 | 70 |
| Fuel | 179 | 35 |
| Live stock | 8 | 75 |
| Meat | 418 | 89 |
| Vegetables | 173 | 22 |
| Produce and poultry | 431 | 27 |
| Bar expense | 34 | 75 |
| Bar room | 416 | 22 |
| Interest and exchange | 2 | 75 |
| | $2376 | 83 |

In addition to the above $2,376.83 there is yet to come in:

| | | |
|---|---|---|
| Craig, Davis & Co.'s bill............................... | $56 | 31 |
| Barker & Johnson...................................... | 68 | 08 |
| C. P. Organ.............................................. | 17 | 50 |
| Due employes for November.......................... | | |
| Rent for November..................................... | 245 | 00 |

Also a meat bill from La Rose, electric light, telephone, and fifty cents at Rhodes & Troxell.  That is all that I know of.

### Receipts.

| | | |
|---|---|---|
| Hotel register...........................................$ | 1096 | 72 |
| Dining room............................................ | 1448 | 06 |
| Lunch room............................................. | 299 | 95 |
| Bar room................................................ | 729 | 61 |
| Profit and loss......................................... | | 04 |
| | $3574 | 38 |

The admission of the above evidence is specifically referred to and assigned for error in the first paragraph of the petition in error, but is only referred to in the brief in a very general way as a part of the testimony of C. F. Iddings, contained in pages 1 to 36 of transcript.  This paper was not offered in evidence by the defendant, nor received by the court as a book of account, nor as evidence of the facts or statements therein contained; but as evidence that the plaintiff made, or procured to be made, the statements there contained, as showing the state and condition of the business, and also as tending to fix the value of the property and business, which the defendants were then in the act of purchasing, or about to purchase, from him. For this purpose I think the paper admissible, and in the absence of argument, or authority to the contrary, it is so held.

The testimony of C. F. Iddings was continued as follows:

Q. What part of this book shows the inventory of the goods you purchased?

A. This part relating to groceries, liquors, and cigars. There is no page mentioned in the book.

Q. Does that book show the full inventory of the property got and the prices for all of it?

A. It is supposed to, but it does not show it.

Q. Who made that book?

A. Mr. Felt made a portion of it. The items are in another handwriting; the dollars and cents are in Felt's handwriting.

Q. Was that inventory and those footings used in the consummation of the trade made by you?

A. Yes, sir.

Counsel for defendant here offered the inventory in evidence. Plaintiff's counsel objected to the evidence, as immaterial and irrelevant, and upon the further ground that the defendants have not proven that Salisbury knew anything about this inventory, or had anything to do with it, which objection was overruled and the paper admitted in evidence. This paper covers a little more than three pages of the bill of exceptions. It appears to be an invoice of sundry and various articles of chattel property, consisting in great part of cigars of various brands, and liquors of sundry and various kinds in different parcels and quantities. This invoice contains several barrels of whisky, but I am unable to identify either or any of them as those referred to in the answer. It contains eleven cows at $50 each; two items of brandy, one is set down as "Cognac brandy, thirty-nine gallons at $6.50, $253.50," the other as "Imported brandy, seventeen gallons, at $6.50, $110.50;" also "one cask California brandy, twenty-five gallons at $2.50, $62.50;" also "one cask California wine, twenty-three and one-half gallons at $2, $47;" also "one barrel dry Catawba wine, fifteen gallons at $2.45, $37.97," and "one barrel tomato catsup, eleven gallons at 90 cents, $9.90."

At the close of this inventory is the following total

footing, which evidently also contains $2,272.26 brought
forward from some other page....................... $8115 29
And the following: Furniture and fixtures esti-
   mated as worth 25 per cent more than when
   took possession of house; 25 per cent added
   to $7,717....................................... 9646 00

                                          $17761 29
Less error on first page of inventory.............. 242 49

                                          $17518 80

The testimony of the witness was continued as follows:

Q. State what that book is that you have.

A. This is the inventory of the furniture and the bed
clothing, tableware, and such like. Yes, here are the totals
of the different rooms.

Q. Is there anything else there?

A. The different tableware; everything contained in the
table line, etc.

Q. What is this?

A. That is the grand total of $12,772.01.

Which was objected to by plaintiff's counsel, who pro-
ceeded to examine witness as follows:

Q. What is that book?

A. It contains the minute inventory of each room in the
house; what contained, that is, all the beds, carpets, chairs,
bedclothing, and also the tableware and tables, furniture,
and fixtures of the dining room and kitchen, and the range.

Q. When was that book made?

A. Just prior to the purchase by my brother.

Q. Who made it?

A. That was made by Mr. Rockafellow and Mr. Felt.

Q. Did you see them make it?

A. No, Rockafellow told me that he made it, and that
was the book. Rockafellow and Felt went through the
rooms together, and Rockafellow said to me he made this
inventory.

Q. All you know about this is what Rockafellow said?

A. Mr. Felt admitted it. He was there and admitted that he made such an inventory.

Q. All you know about the taking of that inventory is what Rockafellow told you?

A. He told me that he and Felt made it and that they were together.

Q. At the time Rockafellow told you?

A. Yes, sir; Felt had been there two or three weeks prior to that.

Q. How long before you made the purchase?

A. I don't remember; it might have been a week or two or three weeks. The negotiations were commenced by Salisbury, and I think before it was finished.

Q. (By counsel for defendant.) What use was made of these footings in this inventory in this trade?

A. They were the basis of the trade, and used as such.

Counsel for defendant here offered in evidence pages 9 to 56 inclusive. Plaintiff objected, as immaterial, irrelevant, and incompetent, which objection was overruled and the evidence received.

But three pages of this book are copied into the bill of exceptions, to-wit, pages 37, 45, and 46. The articles invoiced consist of kitchen furniture, with the value of each article respectively set opposite, including one range and fixtures, $1,000; contents of twenty-nine rooms, including parlor and bath room, halls, attic, dining room furniture, tableware, pantry room, lunch room, kitchen, office, bar, hall, and stairs, sundry bar and store room, with value of contents of each set opposite thereto, amounting in the aggregate to $12,772.01.

The above paper and evidence are held properly admitted upon the same ground as that mentioned under the first head, of which it is really a part.

The examination of the last witness was continued.

Q. How much did you say was the consideration for the

one-half interest of the goods in the house, and the house itself?

A. That included the goods, furniture, fixtures, supplies, liquors, and groceries.

Q. What was the consideration, agreed on, for that amount?

A. Six thousand eight hundred and seventy-five dollars.

Q. What, if anything, else did you agree to do in the premises?

A. If any other bills came up, Mrs. Sweetland having been a partner in the old firm, the bills had to be paid; we were to go on and pay other claims, as they came in.

Q. How much indebtedness did you assume?

A. What indebtedness is shown there, and to the extent of $100 in addition to that.

Q. Did you assume that wholly, or the one-half of it?

A. One-half of it.

Q. Was it in addition to the $6,875, the consideration?

A. I think it was all included in that; I think the balance sheet shows that makes the whole indebtedness.

Q. Have you ever had any conversation with Salisbury since the house was closed and the notes coming due, with reference to these notes?

A. Yes, sir, in December, 1885; it was shortly after the Pacific Hotel Company rented all the hotels on the line of the road.

Q. State what conversation you had with him then, with reference to his allowing the amount that you had paid on this old indebtedness against the hotel, over and above the amount that you had assumed.

A. Salisbury came to me and wanted the note paid. He knew the house in Cheyenne would be compelled to be sold for a good deal less than it was worth. The Pacific Hotel Company had rented it, and also our house here. Salisbury came on, evidently with the idea of collecting the notes. I told him I would like for him to wait until

the house was sold, when we would have some ready money; he said no. I told him there were some amounts due us, and we had paid more than we had agreed to pay, and there was a settlement to be made. The notes amounted then to nearly $5,000. He says it cannot amount to that, not more than half of it, and I want you to pay all you can to secure us. He wanted to be secured. I said, I would rather wait until the hotel was sold; he said, no. I said, I was willing to pay all I had agreed to pay, and that would amount to $2,000 or $2,500 more than we agreed to pay.

Q. What did he say at that time, and promise about the allowance of any sum you had paid out on the accounts due against the house, over and above what you did agree to pay?

(Objected to, as irrelevant, and objection overruled; exception.)

A. He said he was perfectly willing to allow it, and that it was proper that he should.

Q. What had he ever said as to the allowance of overcharges that had been made for the property?

A. He said, "You know we will settle this matter up squarely," that he had always done so well, and knew I had confidence in him, and it would all be settled up satisfactorily.

Q. State whether or not you relied upon his representations concerning this property.

(Objection by plaintiff, for the reason that it has not been shown that Salisbury made any representations whatever in relation to any property which was sold, and that the question is not confined to any specific property. Objection overruled and exception taken.)

Q. How long had you been acquainted with Salisbury?

A. Since 1878. I was in his employ until I went into partnership with Mrs. Cash in 1882.

Q. Were you in the employ of the plaintiff from 1878 to 1882?

A. About that time, between three and four years.

Q. What business was he engaged in?

A. Mining and staging.  The star-route business.

Q. State if he ever made any representations to you about the amount of this hotel property you purchased for your brother, and what these representations were?

(Objection by plaintiff, unless it states the time and place and the witness states the language used.  Objection overruled and exception taken.)

A. He first stated in regard to the property at North Platte, when he came to ask me to take the property, that it was a good paying business property, and if rightly managed ought to pay out in a year or a year and a half; that I was acquainted with the business, and at Cheyenne it was much larger, and all that was necessary was to run the business economically.

Q. What did he say with reference to the quantity and quality of the property as shown by the inventory on which the trade was made?

A. That, he said, was gotten up by his clerk, and he had him get it up as carefully as possible, and he relied on him as being very competent and accurate.  He knew that everything was straight and correct.

Q. Did you make any other inventory of the property other than that made by the plaintiff in this action?

A. I did not make it, only through my brother when he came back, when he took possession of the house after the trade had been consummated.  We did that to find out whether the other inventory was correct or not.

Q. State whether or not, in making this trade, you relied upon the inventory made and furnished by the plaintiff in this action and representations made by him.

(Objected to, as leading.  Objection overruled and exception taken.)

A. I depended entirely upon what he furnished me to go

48

by. In fact I considered whatever he did, at that time, was perfectly honest and straight.

Q. With whom was this trade made?

A. With O. J. Salisbury.

Q. Did you have any trading with Sweetland in that respect?

A. I never spoke a word to Sweetland, and he never said anything to me about it in any shape.

Q. Did any one act for Sweetland in the trade?

A. No, sir; I will say that I spoke to him this much: after the trade was all consummated, in making the transfer Mr. Sweetland was there at the time, when he told the lawyer to make out the papers for the transfer to my brother.

Q. State why the note was drawn in favor of Sweetland.

A. We calculated we were going to pay those notes at maturity. My brother expected to have $1,800 shortly, that was in litigation, and he expected to pay the notes, and expected that the house would pay out right along. He intended to pay so much per month on the notes. However, if not, that we should have the time on it. That was our idea that we should have the notes there.

Q. State the substance of what was said about the money going to Salisbury.

A. The substance of it was that Sweetland was to remit the money to him each month, what we paid each month on the notes; if my brother got his money from the judgment which he anticipated, it would be paid and remitted.

Q. What consideration, if any, did you receive from Sweetland for these notes?

A. No consideration whatever.

The plaintiff in error, in bill of exceptions, relies upon the alleged error on the part of the court in overruling his objections to that part of the above testimony indicated by the objections and exceptions noted.

The first of the objections which refers to what the

plaintiff said to the defendant witness was clearly admissible, as the declaration of the plaintiff and a part of the *res gestœ.*

The second clause which refers to the reliance of the defendant upon the statements of the plaintiff to him was admissible, although, as it appears further on, that the trade was consummated shortly after such statement was made, that the defendant relied upon them would probably be presumed; yet I know of no rule of evidence which would exclude it.

The objections under the third head, as to representations made by the plaintiff as to the amount of property involved in the sale, and what such representations were, is based upon the omission of defendant's counsel to call the attention of the witness to the time and place of the making of such declarations by the plaintiff. Instead of this being a ground of objection to the question, had counsel pursued the form indicated by the objection, the question would probably be objectionable as leading. It was not objectionable for counsel to frame the question as was done in general terms, nor was it objectionable on the part of the witness in his answer to state any declaration of the plaintiff in respect to the kind, description, and value of the property, made at any time during the negotiations.

By reference to the witness's answer it will be seen that he sufficiently located the declarations of plaintiff testified to as to time and place. The objection, therefore, must be overruled.

The next point made in the bill of exceptions refers to the re-examination of this witness. It appears from the cross-examination, and re-examination, that upon the purchase of the hotel property at Cheyenne by the Iddingses three promissory notes of about equal amounts were made by them for the purchase money, payable to the order of N. Sweetland, and that two of the notes had been paid. It also appears, from the whole case, that this witness, C. F.

Iddings, was at that time in partnership with a Mrs. Cash in conducting the hotel and eating house at North Platte, under the name of Cash & Iddings, this Mrs. Cash being a sister of the plaintiff. The testimony of C. F. Iddings comes down to the time of the dissolution of the firm and the settlement of its affairs. Upon his redirect examination the witness testified in reply to interrogatories as follows:

Q. State to whom you made payment upon the note sued on.

A. I made it to Mrs. Cash.

Q. Explain the circumstances under which the payment was made.

A. It was at the time we passed the deeds, bills of sale, and the final settlement of the business of the firm of Cash & Iddings. Mrs. Cash took a certain amount of property and I took a certain amount, and after we had figured up the value of each, we had given possession of the respective properties prior, but we had not the inventories, and whenever it was, on the date of final settlement mentioned, we figured up the value of each property. After Mrs. Cash had figured on the value of her property and I had figured up mine, there was that much money due me from her. She presented the note in place of giving me money I supposed I was to get. I then stated to Hinman that I did not want to pay that; that note is not to be paid. Salisbury admitted—— (Objected to, as incompetent and irrelevant. Objection overruled and exception taken.) I objected to the payment of the note; Mrs. Cash insisted upon it; on the indorsement of the money. Hinman knew the circumstances, and said I had better pay it, and fix up this business.

Q. Was this in the presence of Mrs. Cash?

A. No, sir; that was advice to me about the payment of the note.

Q. Why did you make that payment?

A. Because I did not want it to go into litigation with

·my property; I was afraid of that if I did not get deeds, or bills of sale—that was the reason I made it.

Q. (By the court.) 'What did Mrs. Cash say as to who ·owned the note ?

A. She did not say, but she refused to sign the bills of .sale and deeds unless I allowed the money to go on that note. (Objected to and overruled.) She objected to sign- ·ing the deeds and bills of sale unless I paid the money on ·that note.

Q. Could you get a. settlement and a dissolution of the ·partnership between you and the Cashes without allowing this amount to be credited by Mrs. Cash upon this note in ·question.

A. I could not get a settlement of the business without ·that.

The point raised seems to be to the question by the court. As I understand the testimony, Mrs. Cash, the sister of plaintiff, had this note in her hands, which, though payable ·to the order of N. Sweetland, was indorsed by him, and by the plaintiff; that she claimed to hold it as the property ·of the plaintiff, and claimed its payment for him, and on his account, out of the proceeds of the dissolved partner- .ship then being settled up, or so much of the proceeds as was coming upon such settlement to the witness, C. F. Id- ·dings. In holding the note, and presenting it for payment, ·she was acting as the agent of the plaintiff, and I see no ·objection to the question propounded by the court, nor to ·the answer of the witness, as to any representation which ·she made, the same being a part of the *res gestæ*.

The next thirteen points of objection arise upon the over- ruling of as many objections by the plaintiff to the testi- mony of the defendant H. A. Iddings, who testified in behalf of defendants. These errors are not argued by ·counsel in the brief, and will therefore be referred to only ·in a general way.

By reference to the inventories and exhibits, it is seen

that the same contain certain articles of cigars, barrels of whisky, brandies, wines, accounts, and a certain range and fixtures.

The general theory of the defense is that they bought one-half interest in the hotel and eating house property, which had formerly been sold to N. Sweetland and H. G. Rockafellow by the plaintiff, wholly on credit, and had been kept and managed by them for a year or more, and that shortly before the purchase by the defendants, Rockafellow had turned his interest back to the plaintiff, and that it was this interest that the defendants purchased; that the theory of Rockafellow turning his interest back to the plaintiff was somewhat indefinite, but that about that time, probably commencing before and continuing after, more with a view to the sale of such interest to the defendant than to the transfer of it by Rockafellow to the plaintiff, an inventory of the property had been taken, by clerks sent there for the purpose by the plaintiff, and that in the purchase of said interest by the defendants from the plaintiff they had relied upon this inventory as to the quality, quantity, and value constituting the stock of the business purchased.

The testimony of H. A. Iddings, the principal of the note sued on, and the Iddings who personally took possession of the half interest, and for a while carried on the business at Cheyenne, as a partner of the Sweetlands, is chiefly directed to the condition in which he found the property upon taking possession of it. That certain articles contained in this inventory, to-wit, two barrels of whisky charged up at $270.27, proved not to be the property of the house, but of the firm of Iddleman & Bros., of Cheyenne, and which had been left there by the owners with an expectation that the house would buy it, which it never did, and was afterwards removed by them; that a certain barrel of brandy contained seventeen gallons, and was charged up at $6.50 per gallon, and freight thereon at

thirty-one and one-third cents per gallon as its actual cost,
when the bill of the brandy showed that it had been
bought of Iler & Co., of Omaha, at $2.50 per gallon,
showing an overcharge of $164.22; also, that a certain
cask of twenty-five gallons, inventoried and charged as
brandy at $2.50 per gallon, proved to be an inferior article
of California wine worth not more than $1.50 per gallon,
making an overcharge of $25; also, one cask of fifteen
and one-half gallons charged as dry Catawba at $37.97,
which was absolutely worthless and was thrown out; also,
three casks of California wine, containing in all ninety-five
and one-half gallons, was absolutely worthless, without
statement as to price; also, cask of tomato catsup, eleven
gallons, charged at $9.90, which was spoiled and worthless.
It also appears that the range and fixtures which the wit-
ness testifies were inventoried at $1,250, but which, as I un-
derstand the inventory, should have been stated at $1,000,
and which were absolutely worthless for the purposes re-
quired, but it would appear had for some time been used
unserviceable by Sweetland and Rockafellow up to the
time of the sale to defendants, when, by the united evidence
of all the witnesses who testified in regard to it at the
trial, it had to be replaced by a new one. It appears that in
this sale the hotel and bar bills, of whatever length of
standing, were invoiced and charged up at their face value.
The witness was interrogated and answered as to the un-
collectible worthlessness of certain of these bills.

It will be seen, by reference to the answer, that the
principal allegation is "that the plaintiff sold to the de-
fendant the one half interest in said fixtures, furniture,
stock, and credits in said Union Pacific hotel, and in sell-
ing the same falsely and fraudulently represented the value
of the same and the quality of the articles so sold, and
upon the statements so made by plaintiff in reference to
the articles therein, and the quantity, quality, and value of
the articles therein contained, defendant entirely relied, and

purchased the principal part of the same, to-wit, the articles and credits hereinafter mentioned in said statement, to-wit, that said one-half interest was sold to H. A. Iddings for $6,865, etc., with specifications as to the articles upon which false statements and representations were made."

The purpose, and evident tendency of the testimony of this witness was to prove and point out the several respects in which the articles sold failed to come up to the representations made. This evidence was necessary to make out the defendant's case upon the theory of the answer. The answer was replied to and the trial had thereon; and without specific allegation or argument showing the same to be inadmissible, or in violation of some rule of evidence, as it is left in the plaintiff's brief, I must express the opinion that it was properly submitted to the jury.

Some further point is sought to be made to certain testimony of Rockafellow, but the specific part excepted to is not pointed out with sufficient certainty to enable me to distinguish and consider it.

This witness testified that from the fall of the year 1882, to that of 1883, he was engaged in business in Cheyenne, carrying on a railroad eating house and hotel; that the plaintiff O. J. Salisbury furnished the money to buy out the business of the former proprietor, Jones, and that witness carried on the business for about thirteen months.

Q. Did you at any time sell any interest to any other person, or did any one take an interest in the business with you? (Objected to, as immaterial and leading. Objection overruled and exception taken.)

A. Yes, sir; Mrs. Sweetland, Mr. Salisbury's sister.

Q. What relation did she bear in a business sense?

A. Mr. Salisbury furnished them the money.

Q. What was the firm name?

A. Sweetland & Co., and I was the company.

Q. At what time did you sell out?

A. While the inventory was being taken I gave them possession.  I did not have anything more to do with it after about the middle of October, 1883.

Q. To whom did you sell? (Objected to, as incompetent. Objection overruled and exception taken.)

A. I transferred my interest to O. J. Salisbury.

Q. At the time you sold to him was there an additional inventory taken? (Objected to, and overruled; exception taken.)

A. Yes, sir.

Q. State whether or not there was a range in the hotel at that time and its value and general appearance. (Objected to.  Overruled and exception taken.)

A. Yes, sir, and it was no earthly good; I had to be repairing it most every day in the week.

Q. What was its appearance to a casual observer? (Objected to.  Overruled and exception taken.)

A. It appeared to be a first-rate range to a person not knowing anything about it.

Q. Of whom did you buy the furniture and fixtures?

A. Of G. M. Jones.

Q. To whom did you sell? (Objected to, and overruled.)

A. I transferred my interest to Salisbury at that time.

Two or three of the foregoing questions were in form objectionable, as leading the witness toward his answer.  It appears that the plaintiff was not represented at the taking of this deposition, and that the objections to the several questions were, so to speak, interlined at the trial.  The several objections on account of immateriality and incompetency were properly overruled, and had those made as leading been taken at the time of taking the deposition, the questions would doubtless have been modified to avoid the overruling of the objection, and none of them seem to me to contain prejudicial error, and certainly not sufficient to control the judgment.

C. B. Felt testified that he resided in Salt Lake City;

that he was in Cheyenne in December, 1883; that before coming there he was employed as book-keeper for Gilmore, Salisbury & Co.

Q. Why did you come to Cheyenne?'

A. Mr. Salisbury informed me he had received word from Mrs. Sweetland that their books were getting into a tangled condition, and would like to get me to come down and straighten them out; and, in case she sent for me, he gave me permission to go. In the latter part of November I received a telegram from Mrs. Sweetland asking me to come, and I went and remained five weeks; that he took the books as he found them, the clerk being behind some eight days, and gathered up all the papers he could find in a diligent search, and put everything upon the book under the instruction of Mr. Rockafellow and Mrs. Sweetland; that he took off a balance sheet from their books; that Rockafellow and Mrs. Sweetland were running the house under the name of Sweetland & Co.; that it was the same hotel that Iddings afterwards bought an interest in; that he took off a statement showing the business up to November 1, and subsequently a statement from November 1 to December 1; that no one assisted him on the regular books of the hotel, but when he arrived there, Rockafellow and another named Voorhees were taking an inventory of the contents of the hotel, which witness described how taken and made up.

Q. (By plaintiff's counsel.) State if you know what that means on page 100 of defendant's Exhibit B.

A. That means that while we were at work upon the inventory, putting a value on the goods and on the property in the house, in shape of furniture, it was discovered between Rockafellow and Mrs. Sweetland, as to the value of the property compared to what it was when they took it, that the business was such as to warrant their putting on an increased valuation on account of incumbrances of the business, and hence this entry was made.

Q. That is on furniture and fixtures estimated and worth. 25 per cent more than when they took possession of the house?

A. Twenty-five per cent added to the $7,717.

Q. What does the $7,717 represent?

A. The inventory of valuation of the furniture and fixtures taken from the ledger account as being the amount paid when they took possession of the property—of the furniture and fixtures.

Q. Then that was added to the price they paid for the furniture and fixtures.

A. Yes, sir.

The examination of the witness was continued at great length.

Q. Do you remember anything about two barrels of whisky being charged on the list, that were claimed by Idleman Bros.?

A. I am not aware of any whisky claimed by them on this list, although I do not know that it was not.

Q. Are you aware of the fact of their claiming any whisky?

A. I was informed by Rockafellow. (Objected to by counsel for defendants.)

Q. Was Rockafellow one of the owners of the property when he talked to you about it?

A. Rockafellow informed me that there was one barrel of whisky about the premises which belonged to Idleman Bros.

Q. Did he say anything about that being put into the list?

A. No, sir.

Q. Was there anything said in relation to that barrel of whisky in the presence of Iddings?

A. Yes, sir; I could not give the exact language, but the fact was referred to, of a barrel of whisky belonging to Idleman Bros., sent over by them without having been

ordered, and C. F. Iddings suggested that we walk up to Idleman's and request them to take it away. * * *

Q. Who was the owner of that property when you went to Cheyenne, at request of Mrs. Sweetland?

A. I do not know what knowledge on that point would consist of.

Q. Who claimed to own it? (Objection overruled.)

A. Rockafellow and Sweetland?

Q. To whom did Rockafellow transfer his interest?

A. I only know the general publication of that fact—the publication of the notice of dissolution of the partnership in the newspapers. (The defendants' counsel objects, as not the best evidence, the publication being better, and the agreement of dissolution being the best. Objection sustained and plaintiff excepted.)

Q. At what time did you see the published notice? (Objection sustained.)

Q. In what paper was the notice published? (Objection sustained.)

Q. Was it published in Cheyenne newspapers? (Objection sustained.)

Q. State now the contents, as nearly as you can remember them, of that dissolution notice. (Objection sustained.)

Q. When did you last see one of those notices, and in what paper? (Objection sustained.)

The above rulings of the court constitute the foundation of the last point presented in the brief, as errors of law on the trial. There are two reasons why this objection cannot be sustained.

First—The testimony as offered was not admissible, as not being the best evidence of the fact sought to be proved.

Second—There was no offer to prove any stated fact or facts by the testimony presented.

The following instructions to the jury, asked by defendants and given, are assigned as error:

"No. 1. If the jury find that the plaintiff was negotiating

the sale of the property in question, and was making representations to Iddings, and was interested in the sale, and the notes were made payable to Sweetland, at the suggestion of the plaintiff, and then indorsed by Sweetland to the plaintiff, the plaintiff does not stand in the position of an innocent purchaser of negotiable paper before due, but would be chargeable with any equities existing between the makers and payers of the note in the action."

The entire evidence, as a whole, tends to prove that the plaintiff was the real owner of the property; that he advanced the purchase money for it, in the name of Sweetland and Rockafellow; that it was carried on in their names at his sole risk, and that almost, or quite, contemporaneous with the sale of one-half interest to the Iddingses, Rockafellow turned over the half interest standing in his name, to the plaintiff; that Rockafellow was entirely unknown in the sale to the Iddingses, which was made by the plaintiff, and the note executed to the order of N. Sweetland, at the request and by the direction of the plaintiff. No other conclusion could be drawn from the testimony. The instruction objected to was, therefore, rightly given, and could hardly have been more favorable to the plaintiff, in view of the evidence and the facts of the case.

"No. 2. If you find from the evidence that the defendants have claimed a defense to the note in action in the hands of Salisbury, prior to the date of indorsement on the note, in order to make this indorsement a ratification of the contract, it is incumbent on the plaintiff to show that the indorsement was voluntarily made by Iddings, with all the circumstances of the sale."

I see no objection to this instruction. As hereinbefore stated, C. F. Iddings, the joint maker, but, in fact, a surety, being in business as a partner with Mrs. Cash, a sister of the plaintiff, the partnership dissolved and in process of settlement, leaving the assets in the hands of Mrs. Cash, and certain payments therefor being about to be made to

Iddings, she presents the note sued on as agent of the plaintiff, and demands that the money due Iddings on settlement be left in her hands for the plaintiff, as the owner of the note, and indorsed thereon, instead of being paid, on settlement, to Iddings, which he consented to, solely to avoid a lawsuit and to get rid of litigation. The instruction tells the jury simply, "That in order to make this payment or indorsement a ratification of the contract, it was incumbent on the plaintiff to show that the indorsement was voluntarily made by Iddings, with all the circumstances of the sale." I think the court might, with propriety, have gone further and told them that had it even been voluntarily made, it would not have estopped the defendant from claiming all that has been given him in the case.

The plaintiff also claims error in giving the third instruction of the court of its own motion, as follows:

"If you find the plaintiff sold the hotel fixtures, or that they were sold on his account, you will proceed to adjust the alleged differences between the parties, if the plaintiff represented to defendants that there was more property in the hotel than there actually was, and the defendants were thereby deceived, and, relying upon the representations of the plaintiff, bought the property and gave the note sued on, they are entitled to a credit for the shortage, and if the shortage exceeds the amount of plaintiff's claim, they should have judgment for the excess; so, too, if any of the articles transferred were worthless or unfit for use, and that fact was unknown to defendants at the time of the transaction, the defendants should have credit for the difference in value of the defective articles, as they were, and as they ought to have been, under the contract; so, too, if there was a failure to deliver a cow sold, or any other of the articles sold, you will give the defendants credit for value of the articles sold which were not turned over, and if the accounts to the hotel were guaranteed, and could not be collected, the defendants should not bear the loss."

I do not think this instruction liable to the objection offered by plaintiff in the brief. It is expressly given on condition that the jury find that the plaintiff sold the hotel fixtures, or that they were sold on his account, thereby excluding the supposed case of the plaintiff's brief, that the instruction was equally applicable, and left the jury to infer that if Sweetland sold the property, as agent for the plaintiff, or any other person, the plaintiff would be liable to defendant for damages. The case doubtless turned on this instruction, and for aught that appears to me it is sufficiently based on the evidence and the law arising from it.

Counsel in the brief complain, generally, of the instructions, that they directed the attention of the jury to the facts favorable to defendants, leaving out of view all that tended to illustrate the theory and claim of the plaintiff. The first instruction by the court of its own motion charged the jury that the plaintiff was entitled to recover the amount of the note sued on, with interest, unless the defendants established their defense by a preponderance of the evidence. By the second it charged them that if the plaintiff was the one who sold the hotel fixtures and on whose account the same were sold, the difference, if any, between purchaser and seller might be adjusted in this case, otherwise not.

Now this was the whole theory of the plaintiff's case. He sued, as is seen by his petition, as the holder and indorser of a promissory note made and delivered by defendants to the order of N. Sweetland, and by him transferred to the plaintiff for value. He discovered no other theory by his pleadings, and, so far as can be gathered from the voluminous testimony, the only facts sought to be established were negative in character, and from which the plain inference was to be gathered that the plaintiff, while the beneficiary of the transactions with the defendants sought to obscure and cover up the fact, and the motive, by the use of the names and agency of the Sweetlands.

While I agree that it is the law that a court in its instructions must impartially present the theory upon which either side prosecutes, or defends, its lawsuit, this theory must be gathered from the pleadings in the case, and the evidence applicable thereto. This, I think, the court has observed, and satisfactorily done in this case.

The judgment of the district court is

AFFIRMED.

THE other judges concur.